## STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 06-857


SUSAN DUNN CARRAGHER

VERSUS

PITTMAN BROADCASTING SERVICES, L.L.C.


************

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT,
PARISH OF CALCASIEU, NO. 2002-4395,
HONORABLE CHARLEY QUIENALTY,
DISTRICT JUDGE PRO TEMPORE

************

## MICHAEL G. SULLIVAN
## JUDGE

************

Court composed of Oswald A. Decuir, Jimmie C. Peters, and Michael G. Sullivan, Judges.


**AFFIRMED AS AMENDED.**

Benjamin W. Mount
Bergstedt & Mount
Post Office Drawer 3004
Lake Charles, Louisiana  70602
(337) 433-3004
Counsel for Plaintiff/Appellee:
        Susan Dunn Carragher

Jimmy R. Faircloth, Jr.
Faircloth, Vilar & Davidson, L.L.C.
Post Office Box 12730
Alexandria, Louisiana  71315-2730
(318) 442-9533
Counsel for Defendant/Appellant:
        Pittman Broadcasting Services, L.L.C.

SULLIVAN, Judge.

Pittman Broadcasting Services, L.L.C. ("Pittman Broadcasting") appeals an award of unpaid wages, penalties, and attorney fees in favor of its former employee, Susan Dunn Carragher. For the following reasons, we affirm as amended.

**Discussion of the Record**

Ms. Carragher was employed by Pittman Broadcasting from January 15, 2000 through October 5, 2001 as sales manager for the radio station KAOK in Lake Charles, Louisiana. Prior to working for Pittman Broadcasting, she had been employed for approximately five years as an account executive by Cumulus Broadcasting ("Cumulus"), where she earned between $47,000.00 and upwards of $50,000.00 in the last two years of her employment there. Ms. Carragher testified that she agreed to work for Pittman Broadcasting after its owner, Dr. Marcus Pittman, guaranteed her a salary of $5,500.00 per month, or $66,000.00 per year, plus commissions, for a minimum of two years. She explained that she accepted Dr. Pittman's offer because of the salary guarantee, so that she would not have to worry about earning commissions anymore.

It is undisputed that for the first three months of her employment at Pittman Broadcasting, Ms. Carragher was paid according to the above terms, but that she received a substantially smaller check in May of 2000. She testified that, when she questioned Dr. Pittman about this, he explained that he was having serious financial problems, but that he would pay her "the balance due" as soon as he received a settlement from a lawsuit involving damage to a broadcasting tower that occurred before she started working there.

In a letter dated May 29, 2000, Ms. Carragher wrote to Dr. Pittman stating that she had left her former job at Cumulus "based on a promise to pay me $5,500 per

month and a commission on sales over thirty thousand," but that "[w]e have continually chipped away at that deal, now to the point of a new pay plan," which plan she described as "unacceptable." She included with the letter a proposed contract with a lower "salary" and "guaranteed commissions" that would not have to be paid until the following month, but that would still guarantee a minimum pay of $66,000.00 per year. That agreement was never signed by either party.

Ms. Carragher explained that she continued working for Pittman Broadcasting based upon Dr. Pittman's assurances that he would pay her "the right amount" when he received the expected settlement proceeds. She testified that she left that job in October of 2001 because of "lack of payment," her inability to live on what she had been receiving, and the failure to "get a straight answer" on when she would be paid what she was owed.

Jane Young, who worked with Ms. Carragher at Cumulus, testified that she was concerned about Ms. Carragher leaving her position there, where she was the leading salesperson who was making "a good bit of money." Ms. Young explained that she overheard the conversation in which Dr. Pittman offered Ms. Carragher the job at his company, when his call came while the two were working together and Ms. Carragher transferred it to a conference call. According to Ms. Young, she heard Dr. Pittman offer Ms. Carragher $5,500.00 a month for two years, which offer was to be put in writing within one week.

Scott Bailey, a longtime friend of Ms. Carragher's who also participated in a program on KAOK, testified that Ms. Carragher sought his advice about whether to accept the position at Pittman Broadcasting. Mr. Bailey testified that he was concerned about Ms. Carragher leaving her job at Cumulus, where she had reached

2

her highest income ever, but that Ms. Carragher explained to him that the new position included a guarantee of $5,500.00 a month and represented a chance to get into management, whereas her job at Cumulus was still on a commission basis.

Justin Morris, a producer who worked with Ms. Carragher at Pittman Broadcasting, testified that he overheard numerous conversations in which Ms. Carragher asked Dr. Pittman, "When am I going to get what's owed?" According to Mr. Morris, Dr. Pittman always replied that it was contingent on receipt of monies from the damage to the tower, as well as from insurance proceeds that would be forthcoming from a fire in which Pittman Broadcasting's office was destroyed in February of 2001. Mr. Morris also described the payment of wages at the station as "completely unstable," in that employee paychecks were rarely delivered in a timely manner.

Ted Williams, who contributed to a gardening program on KAOK, testified that he was present during a "pretty heated discussion" at a restaurant in which Dr. Pittman suggested bringing in a new employee as general manager of the station and Ms. Carragher then brought up that she was still owed a sum of money based upon her guaranteed salary of $5,500.00 a month. Mr. Williams also described a conversation in which Dr. Pittman and Ms. Carragher's husband "were coming almost to blows," with the Carraghers stating, "You're not paying us what you said you would pay us," and Dr. Pittman replying that he would pay them as soon as he received the insurance money.

Dr. Pittman testified that he offered Ms. Carragher only three months at $5,500.00 per month, which amount represented a monthly salary of $1,500.00 plus a draw of $4,000.00 towards future commissions; after the first three months, she

3

would be paid a salary of $1,500.00 per month plus a thirty-percent commission on her advertising sales. He explained that in May of 2000, Ms. Carragher's salary was not reduced, nor was her commission schedule altered, but rather she was no longer receiving the automatic $4,000.00 draw because that was to come from actual commissions. He stated that he did not agree to the terms of the written contract that Ms. Carragher presented to him in May of 2000 and that he was not aware of the letter dated May 29, 2000 until June of 2005. He testified that in May of 2000, when Ms. Carragher began complaining about the commissions, he allowed her to live in a house that he owned rent-free, whereas before she had been paying him $510.00 per month for use of the home. Dr. Pittman also allowed Ms. Carragher to operate her own advertising agency from his broadcasting offices. Dr. Pittman acknowledged that he had spoken of receiving a settlement for the damaged tower, but he testified that when he did so, he referred to using that money to upgrade the station's equipment or to hire additional salespeople, rather than to pay Ms. Carragher any additional money.

Dr. Pittman's wife, Janet, testified that, as a co-owner of the business, she exercised some payroll responsibilities, including keeping an activity log in which she recorded each employee's starting salary, as well as any subsequent changes, and any other information that may affect payroll. Ms. Carragher's activity log reflects an initial entry that states, "Salary: $5500/month[,] first $4000 draw on commission." The next entry reflects starting May 1, 2000: "Salary $1500/month + commissions @ 30%." Mrs. Pittman explained that the second entry was not recorded until May of 2000, and she acknowledged that the first entry did not indicate that the initial arrangement was meant to be in place for only three months.

4

At the conclusion of the evidence, the trial court ruled from the bench, finding that Ms. Carragher had proved her case by a preponderance of the evidence, citing her credibility as well as that of her supporting witnesses. A judgment was later signed awarding Ms. Carragher a total of $42,785.41 in unpaid wages,[1] as well as $16,273.97 in penalty wages and $7,706.54 in attorney fees under La.R.S. 23:632.

## Unpaid Wages

Pittman Broadcasting first argues that the trial court erred in awarding unpaid wages under La.R.S. 23:631, where Ms. Carragher was paid in the amount and manner to which the parties originally agreed, or in the alternative, pursuant to a modified agreement as evidence by the conduct of the parties.

Louisiana Revised Statutes 23:631(A)(1)(b) (emphasis added) provides:

> Upon the *resignation* of any laborer or other employee of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay the amount *then due under the terms of employment*, whether the employment is by the hour, day, week, or month, *on or before the next regular payday* for the pay cycle during which the employee was working at the time of separation *or no later than fifteen days following the date of resignation, whichever occurs first*.

In the present case, Ms. Carragher sought wages in excess of $500.00 due under the terms of an oral contract. In *Smith v. Dishman & Bennett Specialty Co., Inc.*, 35,682, pp. 3-4 (La.App. 2 Cir. 1/23/02), 805 So.2d 1220, 1223 (citations omitted), the court explained the plaintiff's burden of proof in such cases:

> In a suit to recover additional wages in excess of $500.00 under an oral contract of employment the basic rule governing proof is the second paragraph of La. C.C. art. 1846, which requires that plaintiff prove his case by one credible witness "and other corroborating circumstances." The plaintiff may be the one credible witness. "Other

---

[1]The trial court awarded unpaid wages based upon a salary of $66,000.00 per year, subject to a credit for the rent and utilities that would have been due while Ms. Carragher occupied the house owned by Dr. Pittman.

corroborating circumstances" need only be general in nature; independent proof of every detail of the agreement is not required.[2]

Additionally, "the trial court's determination as to the pay rate promised under the terms of the oral contract of employment is a finding of fact . . . ." *Id.* at 1224. Accordingly, the following standard of review applies:

> [A] court of appeal may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. When there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review; the issue for the reviewing court is not whether the trier of fact was wrong, but whether the factfinder's conclusions were reasonable under the evidence. When a factfinder's determination is based on its discretion to credit the testimony of one of two or more witnesses, that finding can virtually never be wrong.

*Id*. at 1223-24 (citations omitted).

In the present case, the trial court found that Ms. Carragher proved her case by a preponderance of the evidence based upon its finding that her testimony was credible, as was that of several witnesses called on her behalf. Ms. Carragher, Ms. Young, and Mr. Bailey all testified regarding Ms. Carragher's concerns about leaving her high-paying, but commission-based job at Cumulus, as well as the importance of a position with a guaranteed salary. Ms. Young testified that she actually overheard the offer and acceptance of a position that guaranteed a monthly salary of $5,500.00 per month for two years. Payroll records establish that

---

[2]Louisiana Civil Code Article 1846 provides in full:

When a writing is not required by law, a contract not reduced to writing, for a price or, in the absence of a price, for a value not in excess of five hundred dollars may be proved by competent evidence.

If the price or value is in excess of five hundred dollars, the contract must be proved by at least one witness and other corroborating circumstances.

Ms. Carragher was issued checks corresponding to this figure for approximately three months. Mr. Morris and Mr. Williams testified as to Ms. Carragher's demands, after her paychecks were reduced, that she was still owed monies based upon a monthly salary of $5,500.00, as well as to Dr. Pittman's assurances that she would be paid with the proceeds from a pending lawsuit. We find no error in the trial court's conclusion that Ms. Carragher proved the existence of a contract of employment through credible testimony and other corroborating circumstances. We further find that the evidence does not support a subsequent modification of that contract, given Ms. Carragher's written objection calling her new pay plan "unacceptable" and the testimony of those who witnessed her continued demands to be paid in accordance with the original contract. The trial court's award of unpaid wages is hereby affirmed.

**Penalty Wages and Attorney Fees**

Pittman Broadcasting next argues that the trial court erred in awarding penalty wages and attorney fees pursuant to La.R.S. 23:632. That statute provides:

> Any employer who *fails or refuses to comply with the provisions of R.S. 23:631* shall be liable to the employee *either for ninety days wages at the employee's daily rate of pay, or else for full wages from the time the employee's demand for payment is made until the employer shall pay or tender the amount of unpaid wages due to such employee, whichever is the lesser amount* of penalty wages. *Reasonable attorney fees shall be allowed* the laborer or employee by the court which shall be taxed as costs to be paid by the employer, *in the event a well-founded suit for any unpaid wages whatsoever be filed* by the laborer or employee after three days shall have elapsed from time of making the first demand following discharge or resignation.

(Emphasis added.)

Concerning penalty wages, the courts have recognized:

> In order for the employee to recover penalty wages, the employer must be found to have acted in an arbitrary or unreasonable manner.

> Only "a good-faith, non-arbitrary defense to liability for unpaid wages, i.e., a reasonable basis for resisting liability" permits a court to excuse the employer from the imposition of penalty wages.

*Dickerson v. Cajun Communications of Texas, Inc.*, 40,026, p. 6 (La.App. 2 Cir. 8/17/05), 910 So.2d 477, 481, *writs denied*, 05-2267 (La. 3/8/06), 925 So.2d 490, and 05-2332 (La. 3/10/06), 925 So.2d 520 (citations omitted).

Attorney fees, however, "are to be awarded in the event that the plaintiff files a *well-founded suit for unpaid wages*, even if penalty wages are not due." *Id.* (emphasis added).

In the present case, the trial court awarded *both* penalty wages and attorney fees upon finding that Ms. Carragher's suit for unpaid wages was well-founded. Although this is the correct standard to be applied in awarding attorney fees, a more stringent standard must be met before penalty wages can be awarded. Specifically, the trial court should have determined whether the employer presented a "good-faith, non-arbitrary" defense that would defeat the claim for penalty wages. *Id.* Because the record before us is complete, however, we are able to determine this issue *de novo*.

In *Dickerson*, 910 So.2d 477, the issue presented was whether the employer and employee had agreed that the employee would be entitled to severance pay should he be terminated within the first ninety days of hire. The court accepted the employee's testimony on this point, then went on to conclude that arbitrary conduct by the employer was implicit in this finding, reasoning:

> The dispute in this case was whether the parties reached an agreement concerning severance pay commencing with the first day of employment. [The employee] testified that the parties had reached such an agreement but that [the employer] had refused to honor it. In finding [the employee's] testimony credible, the court necessarily found that [the employer] *knew and agreed to the severance payments*.

8

*Id.* (emphasis added). The present case, likewise, involves the acceptance of one party's testimony over another's, with the acceptance of that testimony implying knowledge of the disputed terms. Ms. Carragher's testimony, as well as that of at least two other witnesses, established not only her continued demands to be paid per the $5,500.00/month agreement, but also Dr. Pittman's assurances of payment upon receipt of certain funds. On this basis, we find that an award of penalty wages is proper.

Because Ms. Carragher's suit for unpaid wages has merit, the award of attorney fees is affirmed. Ms. Carragher has answered the appeal, seeking additional attorney fees for defending this appeal, which we fix at $1,500.00.

**Decree**

For the above reasons the judgment of the trial court is affirmed, but is amended to award additional attorney fees of $1,500.00. Costs of this appeal are assessed to Pittman Broadcasting, L.L.C.

**AFFIRMED AS AMENDED.**